UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

MELISSA S. NELSON,                    )
                                      )
            Plaintiff,                )
                                      )
      v.                              )      CIVIL NO.  3:13cv1050
                                      )
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for

Disability Insurance Benefits (DIB)and Supplemental Security Income (SSI) as provided for in

the Social Security Act.  42 U.S.C. § 405(g).  Section 205(g) of the Act provides, <u>inter alia</u>, "[a]s

part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record

including the evidence upon which the findings and decision complained of are based.  The court

shall have the power to enter, upon the pleadings and transcript of the record, a judgment

affirming, modifying, or reversing the decision of the [Commissioner], with or without

remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to

any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.     The claimant has not engaged in substantial gainful activity since July 29, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.     The claimant has the following severe impairments: degenerative disc disease with herniations, stenosis, and cervical and lumbar radiculopathy, failed back syndrome status post diskectomy, osteoarthritis and edema of the right knee, left knee effusion, degenerative joint disease of the right foot, heel spurs of the right foot, bilateral tarsal tunnel syndrome, plantar fasciitis, asthma, chronic obstructive pulmonary disease ("COPD"), sleep apnea, hypertension, obesity, fibromyalgia, bilateral Eustachian tube dysfunction, depression, anxiety, and panic disorder without agoraphobia (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  Specifically, she can lift up to 10 pounds occasionally.  She can stand or walk for approximately 2 hours per 8-hour workday, and sit for approximately 8 hours per 8-hour workday.  The claimant is limited to work that allows her to sit or stand alternatively.  She can only sit for 30 minutes at one time, and stand or walk each for 10 to 15 minutes at one time.  She could never do any pushing or pulling of any hand/arm controls or operate foot controls.  She can occasionally balance and climb ramps, but never crouch, kneel, crawl, or climb ladders, ropes, scaffolds, or stairs.  She can occasionally stoop, but never stoop repetitively below the waist.  She should never do any overhead reaching.  The claimant should avoid concentrated exposure to extreme cold, extreme heat, wetness or humidity, and irritants, such as, fumes, odors, dust and gases.  The claimant should avoid all exposure to unprotected heights, dangerous machinery, and slippery or uneven walking surfaces.  The claimant is limited to work that allows her to use a cane to stand and walk.  The claimant is limited to work that will allow her to be off task 10 percent of the workday, in addition to regularly scheduled breaks.  The work should be limited to simple, routine, and repetitive tasks involving only simple, work-related decisions with few, if any work place changes.   The claimant should have only occasional interaction with the public and coworkers.  The claimant is limited to work that allows one absence, on average, per month with absence defined as failing to appear for a scheduled shift; tardy for a scheduled shift; or leaving early from a scheduled shift.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and

416.965).

7.  The claimant was born on September 16, 1969 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from July 29, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 22-37).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

A five step test has been established to determine whether a claimant is disabled. See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is

disabled. A negative answer at any point, other than step 3, stops the inquiry and
leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160,

162n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984). From the

nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative

inquiry.

Plaintiff filed her application for a period of disability and disability insurance benefits

under Title II of the Social Security Act on September 21, 2010 and Supplemental Security

Income under Title XVI of the Social Security Act on June 14, 2011. After the Social Security

Administration denied her application initially on December 21, 2010, and upon reconsideration

on March 7, 2011, Plaintiff timely filed a request for a hearing on March 15, 2011. A hearing was

held before Administrative Law Judge T. Whitaker ("ALJ") on May 10, 2012, in Indianapolis,

Indiana. Plaintiff appeared and testified at the hearing. She was represented by counsel, Attorney

Charles J. Myers. Gail K. Corn testified as an impartial vocational expert ("VE"). The ALJ

rendered a decision on August 6, 2012 denying Plaintiff's claim. Plaintiff timely filed a Request

for Review of Hearing Decision on August 13, 2012. The Appeals Council denied Plaintiff's

Request for Review on August 30, 2013. As a result, the ALJ's opinion stands as the

Commissioner's final decision. Plaintiff now seeks judicial review of that decision.

Plaintiff testified that she was born on September 16, 1969 and is 42 years old. She

completed high school (TR 51). She has not received any other formal education or training. She

is 5'3'' tall and weighs 320 pounds. She uses a cane, which her doctor ordered five years ago

(TR 52). This was due to foot problems and foot surgery. A different doctor ordered her to

continue to use it due to her back (TR 53). She has not worked since December 5, 2006 (TR 58).

She reported that she is right handed and has difficulty with her right upper limb. She is numb

through her shoulder and her hands are swollen all the time (TR 53). Specifically, her whole

palm and the fingers on her right hand are always swollen, and her elbow and shoulder swell as

well. This makes it difficult for her to pick things up and she drops stuff a lot. She also has issues

with her left hand. It goes numb and is swollen all the time. She has difficulty picking things up

with the left hand as well (TR 54).

      Plaintiff testified that she has pain from her lower back down through her right foot. She

is also starting to get pain down the left side as well. In addition, she has difficulty breathing  and

has to use two inhalers due to asthma and COPD (TR 56). Hot and humid weather makes it more

difficult for her to breathe. The inhalers help but do not get her breathing back to normal (TR

57).

      Plaintiff reported that the top symptoms from her impairments are pain and numbness.

She is unable to feel her leg. She has numbness in her right shoulder and hands (TR 64). The

numbness in her shoulder extends from the top of her shoulder up to the base of her neck. It has

occurred for about one year. The pain was not preceded by any specific injury but an MRI

showed two bulging discs in her neck (TR 65). The bulging discs cause stiffness and increased

pain down her right shoulder. At times, she cannot even move her neck (TR 66). She also has

numbness from her lower back, down her right hip and right leg into her right foot. In the last

year, it has also started going down her left side. The numbness in her lower back and right leg is

constant and has been occurring for the last five or six years (TR 65). The numbness makes it

difficult for her to move and she is unable to exercise. Her medication does not help with the

numbness (TR 66).

Plaintiff estimated that she can sit for no longer than 30 minutes at one time. She can stand for ten to fifteen minutes at one time, and she can walk for ten minutes at one time. She is unable to lift over ten pounds and she is not sure if she can even lift that much. She is unable to bend from her waist (TR 53).

Plaintiff reported that she takes prescription medication for her problems. These cause her to be drowsy and unfocused and she has memory problems at times. She stated that these side effects have continued even after she adjusted to the new medication (TR 54). She believes it is the muscle relaxer and pain medication that has caused these side effects. She describes her memory problems as being "spaced out." The pain medication never fully gets rid of her pain and the pain is never tolerable (TR 55). Even on the medication, her pain remains at a seven or eight on a scale of zero to ten with ten being the worst pain (TR 56).

Plaintiff stated that for fun she reads her Bible about four hours per week. The time varies because she is unable to sit for very long. She also reads other Biblical books sometimes (TR 59). She does not have any other hobbies. She goes to church on Sundays but does not participate in any other organizations or events where groups of people are present. She sees relatives once or twice a week when they come by to see her to visit and talk (TR 60). She also has one friend that is not a relative. She sees her friend three or four times per week because she comes over and helps out by doing laundry, cleaning, bringing groceries and taking her to doctor's appointments. She has a driver's license but she does not drive because of her pain and the fact that she has no feeling in her right leg down to her foot (TR 61).

She reported that she does not know how to use a computer. She spends approximately

one hour per day talking on the phone. She gets about four to six hours of sleep per night. She watches television on and off during the day for about an hour and a half total. In a typical day, she wakes up, takes her medicine and then reads her Bible. She sits in a recliner with her feet propped up. She also usually goes to the bathroom and showers by noon. Between noon and suppertime, she typically reads the Bible, watches television, talks on the phone if someone calls, and maybe does a circle word search puzzle. In a typical week, she spends about half an hour doing word search puzzles (TR 63). Between suppertime and bedtime, she takes her medication and watches some Christian shows on television (TR 64).

Plaintiff testified that she spends about six hours total in her reclining chair every day. This is not consecutive as she has to get up and down about every 20 to 30 minutes. She props her legs up while in the chair. She uses the chair because it makes the pain a little bit more tolerable. She reported that she also has problems with her bladder. She has to wear pads 24 hours a day. Her bladder was previously pinned but it has fallen again. She wets herself at night sometimes and she has to change her pads two to three times a day (TR 67). She also has balance problems and she has trouble walking straight. At times she runs into things and feels like she is going to fall over. Her doctor thinks it is due to her ears (TR 71).

She stated that she also has depression. She is unable to take antidepressants due to the side effects but she is on Xanax for her anxiety. She also has issues with her right foot. She has been diagnosed with chronic plantar fasciitis and tarsal tunnel syndrome. She had surgery and they tried shocks on it but it did not work. Her foot is numb and it is painful to be on it for long periods (TR 68). She states that she is unable to work because she can hardly move. She also has obstructive sleep apnea so she does not get much sleep. She is unable to concentrate or focus and

she cannot sit or stand for very long. She does not believe she could do a job even if she were able to sit all day and she could not do a job that required repetitive use of her arms and hands because of the swelling and the pain (TR 69).

The vocational expert, Gail Corn, testified as to the nature of Plaintiff's past work. Ms. Corn stated that Plaintiff previously worked as a food service worker at a hospital. It is listed under the Dictionary of Occupational Titles ("DOT") at 319.677-014, and is classified as medium in exertion (TR 72) with an SVP of 2 (TR 73). In addition, Plaintiff's cleaning work at a church, DOT number 323.687-014, was light in exertion with an SVP of 2 (*Id.*).

The medical evidence of record shows that on May 17, 2010, Plaintiff presented to David G. Short, DO, with complaints of hearing loss in both ears along with associated dizziness and tinnitus. The onset had been gradual and had occurred in a persistent pattern for one week. On exam, she was 63 inches tall and weighed 320 pounds. Her body mass index ("BMI") was 56.68 (TR 394). The operating microscope was used to assist in the removal of impacted cerumen, she had conductive hearing loss, and the bilateral inferior turbinates were boggy. Dr. Short diagnosed impacted cerumen and allergic rhinitis (TR 395).

On July 5, 2010, a chest x-ray showed that interval change had occurred with a large new area of abnormal opacification in the thorax on the right. It appeared infiltrative in nature involving mainly the peripheral portion of the right lung centrally and inferiorly. It was noted that she had a history of COPD with cough and shortness of breath. The final impression was pneumonia (TR 405). On July 14, 2010, x-rays of the chest showed some atelectasis/infiltrate along the right mid lung at the minor fissure (TR 424).

On August 23, 2010, Plaintiff had an appointment at American Health Network. It was

noted that she had a history of chronic low back pain, anxiety, lumbar disc disease and degeneration, osteoarthritis, obesity, hypertension and hyperlipidemia. Plaintiff reported that she had difficulty walking for any more than five to ten minutes at a time and she had difficulty sitting for any more than 15 to 20 minutes before she started having back pain. Bending forward also gave her a fair amount of pain. MRI records from 2007 were reviewed, which showed some central disc bulge at L5-S1, L4-L5, and L3-L4 with generalized bulging of the disc material resulting in mild narrowing of the spinal canal. It was noted that she basically had some lumbar spondylosis and narrowing of the spinal canal and also the right intervertebral foramina at L3-L4. She also had some lumbar radiculopathy (TR 414).

On exam, she weighed 340 pounds, her level of distress was uncomfortable, and her nourishment type was obese (TR 415). She had muscle spasm and moderate pain with motion of the lumbar spine. Ashish Thapar, MD, diagnosed pain in back, lumbar disc herniation, hypertension, obesity, osteoarthritis (degenerative joint disease), lumbar disc herniation with radiculopathy, anxiety state, and positive anti-nuclear factor (TR 416).

On September 17, 2010, Plaintiff complained that her feet hurt, especially where she had scar tissue. She described her pain as a 7 to 8 out of 10, with 10 being the worst. On exam, she had a positive Tinel's sign on the right (TR 410). Her right foot was also very tender with hypersensitivity over the mid arch. She was diagnosed with tarsal tunnel syndrome and neuritis (TR 411). On September 29, 2010, she underwent a functional capacity evaluation with physical therapy. Her prognosis was listed as poor and it was noted she had full body pain, an abnormal gait, and a decreased range of motion. Her diagnosis was listed as arthritis, lupus, and asthma (TR 425).

On October 4, 2010, Plaintiff had an appointment with Paul J. Borgmeier, MD. She complained of diffuse joint aches and pains. She had pain in the MCP and PIP joints of the hands with a history of swelling at times and decreased function. She also had pain and swelling in the wrists and had undergone bilateral carpal tunnel release in the past. She reported some pain in the elbows and she had difficulty fully extending both elbows, although it was more evident on the right. She had pain in her shoulders that radiated into the trapezius muscles, pain in the lower back, around the hips, and in the lateral hip area. It hurt to lie on the hips. She continued to have pain in her knees and pain and swelling in the ankles at times. She had plantar fasciitis in the feet and still had pain through the arch area. She had numbness in the legs and feet at times (TR 434). In addition, she complained of neck pain. She tolerated walking with a cane for about 10 minutes before needing to sit down. She had similar limitations with standing, and bending was painful. Her back and legs hurt and she had increased numbness in the legs after sitting for about 20 minutes. She had difficulty finding a comfortable position in bed, and she noted stiffness in the morning for several hours after waking up. She had some tiredness during the day and reported a history of COPD and sleep apnea (*Id*.).

She stated that she had some headaches, which she attributed to sinuses. She felt her muscles were weaker than normal and she reported spasms at times and various tender spots. She also complained of fatigue and weakness, ringing in her ears, leg edema, anxiety, difficulty sleeping, occasional swollen glands, nausea, palpitation, and muscle spasms. She also became short of breath easily and bruised easily (TR 435).

On exam, her weight was 156.8kg. Her cervical spine and occipital muscle insertions were tender. Range of motion of the cervical spine was significantly decreased in all planes. She

was tender in the trapezius muscles and medial scapular borders and very tender over the lower lumbar spine and sacroiliac joints. The heart revealed a slight systolic murmur over the right second intercostal space. Her abdomen was obese. Her hands showed some mild tenderness around the PIP and MCP joints and her grip strength was diminished. Her wrists had mild tenderness, and her elbows were tender at the epicondyles. Her shoulders had some tenderness and range of motion was fair with mild discomfort. She had some tenderness of the trochanteric bursae. Her knees had some tenderness of the joint and the anserine bursa. Her ankles were tender and range of motion was mildly limited in all planes of the ankles. Her feet had some tenderness of the MTP joints and mildly in the midfoot. Muscle strength was diminished in the leg. Dr. Borgmeier's overall impression was that she had symptoms of fibromyalgia and he noted that recent labs showed a positive screening ANA test but he did not believe she had lupus (TR 436).

On November 3, 2010, Plaintiff underwent a mental status examination with John T. Heroldt, EdD. It was noted that Plaintiff had minor problems filling out the paper work. She was unable to take anti-depressant medications due to interaction with other medications, and she stated that she could not sleep longer than two to three hours due to back pain (TR 453). In addition, she reported that she had gained 50 pounds in the past three years. In the last three months she had begun letting her hygiene go and stated she did not even want to brush her teeth. She can no longer afford treatment and she reported her anxiety seemed to have increased. Also, her depression symptoms did not seem to ameliorate in between periods of depression (TR 454).

On exam, her memory was below average (*Id*.). In regards to daily activities, she reported that her friend and husband do the chores and take care of her. She was transported to doctor's

appointments by her husband or friend. During the interview, Dr. Heroldt noted that Plaintiff ambulated with the use of a cane and rose from the supine position very slowly. She was unable to reach down to pick up her purse. Her affect was flat, and her eye contact was intermittent. Dr. Heroldt diagnosed a major depressive disorder, chronic, severe, without psychotic features and without interepisode recovery, and a panic disorder without agoraphobia. He assigned a global assessment of function ("GAF") of 49 and opined that Plaintiff was incapable of handling her funds (TR 455).

On November 17, 2010, Plaintiff presented to American Health Network with complaints of right knee and leg pain for one week. She reported she had a functional capacity test done one week ago and the pain started after that. She also complained of tender varicosities above the right knee and that she experienced pain when she had to get up and down on the knee. In addition, her knee felt weak (TR 477). On exam, her weight was 325 pounds, she had multiple varicosities on the bilateral lower extremities, and tender varicosities midline superior to the right patella. She also had right knee tenderness and moderate pain with motion of the right knee. She was diagnosed with knee pain, edema, obesity, osteoarthrosis, not otherwise specified, and varicose veins of the leg with edema (TR 478).

On November 20, 2010, Plaintiff underwent a consultative examination with Luella Bangura, MD. Plaintiff reported chronic pain, numbness, and a slight deformity in her right foot. She had trouble walking/standing for longer than 10 minutes. She had a prescribed cane with her at the examination. It was noted that she had a history of plantar fasciitis, diagnosed in 2007, tarsal tunnel syndrome, diagnosed in 2007 and 2009/2010, anxiety and depression, diagnosed in 2007, COPD and asthma, diagnosed in 2008, sleep apnea, diagnosed in 2006, and morbid

obesity, diagnosed in 2006 (TR 492).

She complained of mood swings, isolating herself from others, and short term memory loss. She had to be reminded to take her medication and occasionally to practice hygiene. She used inhalers four to five times per day, a nebulizer as needed, and a CPAP machine at night, although she still had chronic shortness of breath with and without exertion, occasional chest pain, and trouble sleeping. In addition, she had trouble exercising. She also reported previous carpal tunnel surgery but noted that her pain had returned. It was more in the right hand than the left hand (*Id*.). She was diagnosed with fibromyalgia in 2010 and reported full body pain and chronic fatigue (TR 493).

On exam, she was 63.5'' tall and weighed 342 pounds (TR 492). She was able to get on and off the exam table with difficulty due to shortness of breath. It took several attempts to get on the table. She was using a cane and was obese. Her lung sounds were diminished and decreased. She had an antalgic, unbalanced gait. She was unsteady on her feet without her cane and she had difficulty walking without the use of her cane and had to use the walls to steady herself. She had tenderness to palpation of her bilateral shoulders, she was unable to walk on heels and toes, and she was unable to bend over or squat due to lack of balance and shortness of breath. There was also tenderness to palpation of the spine. She had normal sensation to touch but did have pain in her shoulder and feet (TR 494).

Dr. Bangura diagnosed uncontrolled hypertension, hyperlipidemia, COPD, gastroesophageal reflux disease, sleep apnea, fibromyalgia, morbid obesity, plantar fasciitis, carpal tunnel, anxiety, and depression. She opined that Plaintiff would have difficulty standing for long periods of time but would not have difficulty sitting. She would be unable to walk, lift or

carry. In addition, due to her mental impairments, she would have difficulty with memory, sustained concentration and social interaction (TR 495).

On December 15, 2010, she underwent pulmonary function testing, which revealed a prebronchodilator FEV1 of 2.42. This was 85% of predicted (TR 499). On December 21, 2010, DDS medical expert M. Ruiz, MD, listed Plaintiff's primary diagnosis as fibromyalgia. Her secondary diagnosis was COPD, and asthma, hypertension, and obesity were listed as other alleged impairments (TR 503). On January 13, 2012, she complained of worsening fatigue and increased excessive daytime somnolence. On exam, she was morbidly obese, used a cane, and had diminished breath sounds. She was diagnosed with hypertension, hyperlipidemia, sleep apnea, and obesity (TR 547).

On January 25, 2012, she saw Mario P. Brkaric, MD, with complaints of severe and continued pain in her neck, arm, back, and leg. It was noted that she was status post discectomy in the past as well as the fact that she had previously undergone injections and physical therapy. She stated that medication and changing positions made it better, but sitting, walking, lifting, bending, reaching, climbing stairs, and squatting made it worse. The pain prevented her from sleeping. She also complained of dizziness, numbness and tingling, and headaches (TR 517).

On exam, she was obese and in mild distress. She had an antalgic gait and ambulated with a cane. She had spasm with percussive tenderness and a limited range of motion in her neck. She had nerve tension signs and reflexes were diminished in the upper and lower extremities. Motor function of the upper and lower extremities was grossly 4/5, and sensation was diminished to touch. Her back was tender to palpation and percussion (TR 518). Dr. Brkaric diagnosed lower back pain, cervical radiculopathy, and lumbar radiculopathy (TR 519).

On January 30, 2012, Michael H. Fritsch, MD, noted that Plaintiff had some longstanding problems with hearing loss as well as Eustachian tube dysfunction (TR 525). On January 31, 2012, x-rays of the cervical spine showed minimal narrowing at C6-C7 (TR 521). X-rays of the lumbar spine showed findings of disc disease with narrowing of intervertebral discs at L3-L4, L4-L5, and L5-S1 and a vacuum disc phenomenon at L4-L5. In addition, facet joint arthritis was present in the inferior lumbar region and the neuroforamina may be narrowed (TR 522).

On February 6, 2012, Plaintiff underwent a sleep study, which showed obstructive sleep apnea (TR 534). On February 9, 2012, an MRI of the cervical spine showed a central C4-5 disc herniation that deformed the cord, and central bulges at C2-3, C3-4, C5-6, and C6-7 that flattened the anterior cord (TR 516). On February 13, 2012, an MRI of the lumbar spine showed posterior element degenerative hypertrophy at L3-L4 with mild to moderate spinal stenosis and there was an associated moderate right lateral disc bulge which did not definitely compress the right L3 nerve root. It also showed posterior element degenerative hypertrophy at L4-L5 and L5-S1 without significant neuroforaminal compromise. In addition, there was moderate central disc bulge at L5-S1 without significant secondary spinal stenosis or neuroforaminal narrowing (TR 515).

On February 15, 2012, Plaintiff complained to Dr. Brkaric that her pain was worse and she continued to have right lower extremity weakness and neurologic symptoms. Dr. Brkaric noted that he had obtained a new MRI of the lumbar spine that showed three levels of degenerative discs. In addition, her cervical MRI showed signs of disc herniations at C3-4 and C4-5 with some stenosis (TR 513). On February 24, 2012, an exam showed that she was 64.5'' tall and weighed 349.3 pounds. Her BMI was 59.02 (TR 544). On April 10, 2012, she underwent

bilateral T-tube insertion. Her postoperative diagnosis was bilateral Eustachian tube dysfunction, and bilateral serous otitis media (TR 524). On April 13, 2012, she was diagnosed with diabetes mellitus without mention of complication, type 2 or unspecified type, not stated as uncontrolled (TR 539).

On April 30, 2012, Dr. Brkaric noted that Plaintiff had surgery on her back in 2001 or 2002 and that it had not significantly improved her pain. He reported that she had limitations in her lumbar range of motion and that she had difficulty with bending, lifting, squatting, standing, and reaching, as they all increased her pain (TR 528). She also had pain with cervical range of motion. Dr. Brkaric indicated that the lumbar and cervical MRIs from February 2012 were compatible with nerve root compression. In addition, he stated that she complained of decreased sensation in the bilateral hands and that she had decreased reflexes in the bilateral biceps, Achilles, and patellae. Plaintiff had no known atrophy but had decreased strength of 4/5 on examination (TR 528).

Dr. Brkaric reported that Plaintiff would need to change body position or posture to lessen otherwise intractable pain (*Id.*) every 30 minutes. He further reported that MRIs showed spinal stenosis and even though decompressive surgery was previously performed, it did not significantly relieve her pain. She was unable to ambulate without the use of a hand-held device that limited the functioning of both upper extremities, and she could not sustain a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living (TR 529). Dr. Brkaric opined that Plaintiff could stand and/or walk in ten minute intervals for one to two hours a day. She can lift and/or carry less than 10 pounds frequently and less than 10 pounds occasionally (TR 530). She could never bend (TR 531). On May 10, 2012, Dr. Brkaric added that

Plaintiff would be able to sit in 20 minute intervals for a total of four hours in an eight hour day (TR 550).

In support of remand or reversal, Plaintiff argues that the ALJ improperly discredited the opinion of Plaintiff's treating physician. Based on the opinion of Plaintiff's treating physician, Mario P. Brkaric, MD, Plaintiff can do less than a full range of sedentary work and is disabled. Plaintiff contends that Dr. Brkaric's opinion should be given controlling weight and Plaintiff should be found disabled.

As noted above, on April 30, 2012, Dr. Brkaric opined that Plaintiff is able to stand and/or walk in ten minute intervals for one to two hours a day. She can lift and/or carry less than 10 pounds frequently and less than 10 pounds occasionally (TR 530). She could never bend (TR 531). On May 10, 2012, Dr. Brkaric added that Plaintiff would be able to sit in 20 minute intervals for a total of four hours in an eight hour day (TR 550). Plaintiff argues that this means she would be unable to work on a regular and continuing basis and is disabled. According to SSR 96-8p, "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Plaintiff argues that considering she can only sit, stand and walk for a total of six hours a day maximum (one to two hours of standing and walking and four hours of sitting), she could not work eight hours a day, five days a week on a sustained and continuous basis and therefore does not meet the requirements of SSR 96-8p and is disabled.

The ALJ states that "Although I find the claimant capable of lifting and carrying up to 10 pounds on an occasional basis in sedentary exertion work, Dr. Brkaric's April 30, 2010 opinion is otherwise given great weight as it is generally consistent with the objective medical evidence. However, I give little weight to his May 10, 2012 statement filed after the hearing indicating the

18

claimant can only sit for 20 minutes at one time for a total of four hours in an 8-hour day, as it is

conclusory in nature and not consistent with other evidence (Ex. B23F at 2)." (TR 34).

In *Lopez-Navarro v. Barnhart*, 207 F. Supp. 2d 870, 885 (E.D. Wis. 2002), however, the

Court states: "Treating source opinions must be given special consideration." *Dominguese v.*

*Massanari*, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001). If it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and not inconsistent with other

substantial evidence, the ALJ must give it controlling weight. *Id*. (*citing* SSR 96-8p). If the ALJ

finds that the opinion does not warrant controlling weight, the ALJ may not simply reject the

opinion. SSR 96-2p. He still must evaluate the opinion's weight by looking at the length, nature

and extent of the plaintiff and physician's treatment relationship, the degree to which the opinion

is supported by evidence, the opinion's consistency with the record as a whole, whether the

doctor is a specialist, and "other factors." 20 C.F.R. Section 404.1527(d).

"In many cases, a treating source's medical opinion will be entitled to the greatest weight

and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p.

Regardless of the weight the ALJ ultimately gives the treating source opinion, the ALJ must

"give good reasons" for his decision. 20 C.F.R. Section 404.1527(d)(2). *Id*; *Lopez-Navarro v.*

*Barnhart*, 207 F. Supp. 2d 870, 885 (E.D. Wis. 2002).

Plaintiff argues that the ALJ makes no mention of the fact that Dr. Brkaric is the

claimant's treating physician and does not properly consider the opinion under SSR 96-2p. In

addition, argues Plaintiff, rejecting the May 10, 2012 portion of the opinion because it is "not

consistent" with other evidence is improper as the ALJ is using the wrong legal standard. In

*Lopez-Navarro* the court writes, "there are several fundamental problems with the manner in

which the ALJ treated Dr. Roumani's opinions. First, in rejecting them she stated that they were not consistent with the record. This is not the correct legal standard. Pursuant to Ruling 96-8p, the ALJ must give controlling weight to the treating source's opinion if it is 'not inconsistent' with other substantial evidence in the record, *accord.* 20 C.F.R. Section 404.1527(d)(2); the opinion need not, as the ALJ stated be 'consistent' with the record. This is not merely a semantic issue. The 'not inconsistent' standard presumes the opinion's prominence and requires the ALJ to search the record for inconsistent evidence in order to give the treating source's opinion less than controlling weight. Under the standard imposed by the ALJ, the opinion only has controlling weight if the record supports it. Because the ALJ committed an error of law, the decision must be reversed and remanded". *Lopez-Navarro v. Barnhart*, 207 F. Supp. 2d 870, 885 (E.D. Wis. 2002).

Plaintiff argues that, in the present case, the ALJ does not provide any examples of inconsistent evidence and has not shown that she searched the record for inconsistent evidence. In addition, contends Plaintiff, Dr. Brkaric's opinion is actually consistent with the record. In the April 2012 opinion, Dr. Brkaric supported his findings with details from the record. He reported that Plaintiff had limitations in her lumbar range of motion and she had difficulty with bending, lifting, squatting, standing, and reaching, as they all increased her pain (TR 528). She also had pain with cervical range of motion. Dr. Brkaric indicated that the lumbar and cervical MRIs from February 2012 were compatible with nerve root compression. In addition, he stated that she complained of decreased sensation in the bilateral hands and that she had decreased reflexes in the bilateral biceps, Achilles, and patellae (TR 528).

Dr. Brkaric further reported that MRIs showed spinal stenosis and even though

decompressive surgery was previously performed, it did not significantly relieve her pain. She was unable to ambulate without the use of a hand-held device that limited the functioning of both upper extremities, and she could not sustain a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living (TR 529). In addition, the record shows that Plaintiff suffers from obesity and there are multiple times her BMI was over 50 (*see* TR 394, 415, 436, 478, 492, 503, 518, 544, 547). This level of obesity would also add to her problems and gives support to Dr. Brkaric's findings.

Although Dr. Brkaric did not repeat these reasons in the May 2012 opinion, that form clearly stated that it was being sent because a question had been left off the previous form (*see* TR 550). Therefore, contends Plaintiff, a commonsense reading leads to the conclusion that Dr. Brkaric's reasoning was the same in April 2012 and May 2012 when he opined on Plaintiff's sitting capabilities. Furthermore, as Dr. Brkaric's opinion is the most recent opinion in evidence, it is not necessarily inconsistent with the record even if it differs from previous findings. In *Cichon v. Barnhart*, 222 F.Supp.2d 1019 (N.D.Ill. 2002), the Court found that the doctor's report was "not inconsistent, because it is the most recent and could have reflected a worsening of the plaintiff's condition." The ALJ does not take this fact into account in the decision.

Plaintiff argues that the ALJ also disregards the May 10, 2012 opinion because it is "conclusory in nature." Plaintiff contends that this is entirely false. Dr. Brkaric did not make a conclusion that Plaintiff was disabled; he merely gave his opinion about her functional limitations. 20 CFR 404.1527(e)(2) and 416.927(e)(2) provide that the regulations envision treating sources providing opinions on such issues as a claimant's residual functional capacity. The regulations specifically provide that the medical reports should contain, among other things,

a "statement about what you can still do despite your impairment(s) . . . ." (20 CFR 404.1513(b)(6) and 416.913(b)(6). Plaintiff argues that the fact that the May 2012 opinion, when coupled with the April 2012 opinion, leads to the conclusion that Plaintiff is disabled does not make the opinion itself conclusory.

Lastly, argues Plaintiff, even if the ALJ was correct in assuming that Dr. Brkaric's opinion did not deserve controlling weight, she did not properly consider all of the factors required when determining the weight to give the opinion. 20 CFR 404.1527(c) and 416.927(c) state that "unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion." These factors are the examining relationship, the treatment relationship, supportability, consistency, specialization, and other factors. *Id*. The ALJ does not consider all of the factors required by the regulations.

In *Landing v. Astrue*, 2013 WL 1343864 (N.D.Ind. April 3, 2013), the Court remanded the case because:

> Courts in the Seventh Circuit have criticized Social Security decisions in which the presiding ALJ failed to address the checklist of factors set forth in 20 C.F.R. § 404.1527(c)(2) after finding that a treating source's opinion was not entitled to controlling weight. *See, e.g., Campbell,* 627 F.3d at 309 (reversing where the ALJ did not explicitly address the checklist of factors, the proper consideration of which may have caused the ALJ to accord greater weight to the doctor's opinion); *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir.2010) (criticizing the ALJ's decision for failing to address the "required checklist of factors" and remanding with instructions to afford the plaintiff's treating psychiatrist's opinion controlling weight); *Tenhove v. Colvin,* —— F.Supp.2d ——, 2013 WL 694829, at *14 (E.D.Wis. February 26, 2013) (criticizing ALJ's failure to discuss regulatory factors and remanding for reconsideration of weight to be afforded to treating physician's opinion); *Fuller v. Astrue,* No. 12 C 0171, 2013 WL 617073, at *12 (N.D.Ill. Feb.19, 2013) (remanding to consider weight afforded to treating physician's opinion with instruction to explicitly consider the factors set forth in

20 C.F.R. § 404.1527(c)(2) if the ALJ determined that treating physician's opinion was not entitled to controlling weight); *Johnson v. Astrue,* No. 10 C 7848, 2013 WL 453186, at *11 (N.D.Ill. Feb.6, 2013) (same).

In the present case, Plaintiff argues that the ALJ is not giving a treating physician controlling weight and therefore she must consider all of the factors in 20 CFR 404.1527(c) and 416.927(c) when weighing the various opinions in the record. Plaintiff further notes that the ALJ never weighed the DDS opinion at TR 503-510, which is also an error of law as it is against 20 CFR 404.1527(c) and 416.927(c), which states that "Regardless of its source, we will evaluate every medical opinion we receive.").

In response, the Commissioner argues that Dr. Brkaric is not a "treating physician", as he only saw Plaintiff a few times over the span of a few months. The Commissioner contends that the ALJ properly considered Dr. Brkaric as an examining, rather than a treating physician.

The main issue raised by Plaintiff's arguments concerning Dr. Brkaric's opinions is whether there is sufficient evidence in the record to support his conclusion that Plaintiff was unable to sit, off and on, for up to six hours a day. The Commissioner argues that there is no evidence of nerve root compression, that would cause limitations in Plaintiff's ability to sit for 30-minute increments for up to six hours a day. However, the record shows that Dr. Brkaric felt that the MRIs from February 2012 were "compatible" with nerve root compression. (TR. 528).

As there appears to be some confusion on this issue because, as noted, Dr. Brkaric's May 2012 opinion was a short update to his April 2012 opinion, the court will remand for a more in-depth analysis of Dr. Brkaric's opinions and whether he was a "treating physician", considered as a whole. The DDS opinion (Tr. 503-510) should also be properly analyzed.

The court also remands for further consideration of the VE's opinion, which the ALJ

rather cursorily found to be credible.  The court finds this troubling.  As noted near the beginning

of this order, the ALJ set forth Plaintiff's residual functional capacity as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  Specifically, she can lift up to 10 pounds occasionally.  She can stand or walk for approximately 2 hours per 8-hour workday, and sit for approximately 8 hours per 8-hour workday.  The claimant is limited to work that allows her to sit or stand alternatively.  She can only sit for 30 minutes at one time, and stand or walk each for 10 to 15 minutes at one time.  She could never do any pushing or pulling of any hand/arm controls or operate foot controls.  She can occasionally balance and climb ramps, but never crouch, kneel, crawl, or climb ladders, ropes, scaffolds, or stairs.  She can occasionally stoop, but never stoop repetitively below the waist.  She should never do any overhead reaching.  The claimant should avoid concentrated exposure to extreme cold, extreme heat, wetness or humidity, and irritants, such as, fumes, odors, dust and gases.  The claimant should avoid all exposure to unprotected heights, dangerous machinery, and slippery or uneven walking surfaces.  The claimant is limited to work that allows her to use a cane to stand and walk.  The claimant is limited to work that will allow her to be off task 10 percent of the workday, in addition to regularly scheduled breaks.  The work should be limited to simple, routine, and repetitive tasks involving only simple, work-related decisions with few, if any work place changes.   The claimant should have only occasional interaction with the public and coworkers.  The claimant is limited to work that allows one absence, on average, per month with absence defined as failing to appear for a scheduled shift; tardy for a scheduled shift; or leaving early from a scheduled shift.

This is a pretty impressive list of work restrictions.  The ALJ noted that the Plaintiff did not have

the residual functional capacity to perform the full range of sedentary work, and thus "to

determine the extent to which these limitations erode the unskilled sedentary occupational base, I

asked the vocational expert whether jobs exist in the national economy for an individual with the

claimant's age, education, work experience, and residual functional capacity."  The VE testified

that, even with all of Plaintiffs impairments and limitations, she would be able to perform the

jobs of an assembler, packager, inspector and machine operator. These are, essentially, factory

jobs. The VE testified, for example, that there are 900 machine operator jobs in Indiana that the

Plaintiff could perform. The ALJ found the testimony of the VE to be credible. Then, based on

the testimony of the VE, the ALJ found Plaintiff to be "not disabled". This court does not find

the VE's testimony to be credible simply because common sense dictates that if a person cannot

be around dust, fumes, odors, irritants, extreme heat, dangerous machinery, or slippery or uneven

walking surfaces, that will prevent the person from successfully performing 99.9% of the

machine operator, assembler, packaging and inspector jobs in Indiana. Most factories are hot,

dirty, dusty places filled with fumes, odors, irritants, slippery floors and dangerous machinery.

Moreover, factories run at a fast pace and generally do not allow a worker to be "off task 10

percent of the workday, in addition to regularly scheduled breaks". This court finds it incredible

that the VE, or anyone, would realistically expect that this Plaintiff would ever be able to obtain

and keep a job as an assembler, packager, inspector, or machine operator.[1] Therefore, as the

VE's testimony is not credible, there is no sound basis for the ALJ's decision that the Plaintiff is

"not disabled". Thus, the court will remand for a more in-depth analysis of the VE's opinions as

to which jobs (if any) this Plaintiff could perform, given her myriad limitations.

---

[1] Judge Posner's decision in *Browning v. Colvin*, –F.3d –, No. 13-3836 (7th Cir. Sept. 4, 2014), is instructive. As Posner stated: "Most serious, perhaps, as far as we're able to ascertain there are no credible statistics of the number of jobs doable in each job category by claimants like the plaintiff in this case who have "limitations," in her case mental retardation, obesity, and the residual effects of her childhood disease of the leg. The vocational expert's statistics were for all jobs in categories in which some jobs, but clearly not all, might be within the plaintiff's capacity to perform." *See also* Peter Lemoine, "Crisis of Confidence: The Inadequacies of Vocational Evidence Presented at Social Security Disability Hearings," 2002 ; Nathaniel Hubley, "The Untouchables: Why a Vocational Expert's Testimony in Social Security Hearings Cannot Be Touched," 43 Valparaiso University Law Review 242 (2008). (Both cited by Posner in the *Browning* decison.)

<u>Conclusion</u>

Based on the foregoing, the Commissioner's decision is hereby REMANDED for proceedings consistent with this opinion.

Entered: November 21, 2014.

s/ William C.  Lee
William C. Lee, Judge
United States District Court